No. 38,837

Murray H. Hodges and John Anderson, Jr., Coguardians of the Estate of Jackson K. Hurd, Incompetent, *Appellants*, v. Phoenix Mutual Life Insurance Company, a Corporation, M. R. Smith, et al., *Appellees.*

(255 P. 2d 627)

Opinion filed April 11, 1953.

*John F. Eberhardt,* of Wichita, argued the cause, and *Murray H. Hodges* and *John Anderson, Jr.,* both of Olathe, attorneys *pro se,* were with him on the briefs for the appellants.

*George H. Gangwere,* of Kansas City, Mo., argued the cause, and *Samuel D. Newkirk,* of Kansas City, Mo., and *John W. Breyfogle, Jr.,* of Olathe, were with him on the briefs for the appellee, Phoenix Mutual Life Insurance Company; *Howard E. Payne,* of Olathe, argued the cause, and *W. C. Jones,* of Olathe, was with him on the briefs for the appellee, M. R. Smith.

The opinion of the court was delivered by

Price, J.: This is an appeal from an order sustaining defendants' separate demurrers to plaintiffs' evidence in an action to vacate a mortgage foreclosure judgment and to nullify the force and effect of subsequent incidental proceedings, and is the second chapter of the case in this court (*Hodges v. Phoenix Mutual Life Ins. Co.,* 171 Kan. 364, 233 P. 2d 501).

In 1938 one Asa D. Hurd, a widower, and owner of the residence property involved, executed to the Phoenix Mutual Life Insurance Company (hereinafter referred to as Phoenix), his promissory note in the amount of $14,000, secured by a first mortgage on the property in question. These instruments called for semiannual principal

payments of $350, together with interest at the rate of four percent per annum. The mortgage further provided that insurance in the amount of $14,000 should be carried on the property, with Phoenix being accorded the option to declare the entire unpaid balance due and owing in event of default with respect to the insurance covenant. In case of default the note by its terms bore interest at the rate of eight percent per annum.

In October, 1941, Asa D. Hurd conveyed by warranty deed, subject to the mortgage, the premises in question to his son, Jackson K. Hurd, hereinafter referred to as Hurd. Asa D. Hurd died intestate in 1943, being survived by Hurd as his only heir-at-law. In February, 1948, Phoenix commenced an action against Hurd which sought judgment *in rem* for the amount of $7,847.77, with interest at eight percent from date of default and for foreclosure of its mortgage. The sole default alleged was Hurd's refusal to reimburse Phoenix for a $45 premium paid by it for insurance protecting the mortgaged property against loss by fire, lightning and extended coverage, including loss by windstorm. Personal service was had on Hurd but he filed no answer, made no appearance, and no guardian or attorney appeared for him. No guardian *ad litem* was appointed for him. On March 15, 1948, a default judgment in the amount of $7,971.10 with eight percent interest thereon from date, and for foreclosure of the mortgage, was rendered. On June 21, 1948, the property was sold at sheriff's sale for the sum of $10,000 to one M. R. Smith. Eight days later the sale was confirmed and the redemption period fixed at eighteen months. The $10,000 purchase price was disbursed in the following manner: $8,141.14 was paid to Phoenix in full satisfaction of its judgment and interest; $262.44 was applied to the payment of taxes and costs; and the remainder, $1,596.42, was deposited with the clerk of the court for eventual transmittal to Hurd. The latter amount is still in the hands of the clerk.

The period of redemption expired in December, 1949, and a sheriff's deed was issued to Smith, the purchaser. On January 31, 1950, Smith procured a writ of assistance to eject Hurd from the property. It was returned unexecuted. Ten days later Smith procured an alias writ of assistance. This writ was never returned.

In the meantime, on February 3, 1950, a petition was filed in the probate court for the adjudication of Hurd's incompetency and for the appointment of a guardian of his estate. On February 15, 1950, he was duly adjudged to be incompetent and plaintiffs (appellants here) were appointed coguardians of his estate. Five

days later they filed the instant proceeding to vacate and set aside the foreclosure judgment of March 15, 1948. In June, 1950, the guardians sold the household goods and furnishings in Hurd's home at public auction for a sum in excess of $8,000.

Defendants Phoenix and Smith filed separate demurrers to plaintiffs' amended petition in the action to vacate and set aside the foreclosure judgment. The substance of the amended petition and the demurrers is discussed in the opinion in the former appeal, *supra.* Both demurrers were sustained and plaintiffs appealed. This court reversed, and in the course of the opinion holding that the amended petition stated a cause of action said:

"Given the benefit of the inferences to which such allegations are entitled we think that the paragraph of the amended petition last quoted, when considered in connection with the other allegations of that pleading, is to be construed as containing averments to the effect Hurd, an incompetent, possessed means with which to pay off the mortgage and would have tendered the amount due under its terms prior to the rendition of the foreclosure decree and thus defeated the cause of action for foreclosure of the mortgage if he had not been mentally incapacitated or that a guardian *ad litem* would have taken that action in his behalf if one had been appointed for him· as required by statute (*60-408,* supra). When so construed we are constrained to hold the amended petition sets forth a valid defense within the meaning of that term as used in the provisions of sections 60-3011 and 60-3013, *supra."* (p. 373.)

Defendants Phoenix and Smith then filed their separate answers in the nature of general denials. In addition, Smith's answer conceded that he did not obtain possession of the property until December, 1950, some ten months subsequent to the commencement of this action.

The issues being thus joined, plaintiffs, in January, 1952, made and filed a supplemental written tender by the provisions of which they offered to pay into court for the benefit of Phoenix and/or Smith a sum of money to cover the costs in the foreclosure action; an amount which, together with the sum of $1,596.12 in the hands of the clerk of the court, would equal the sum of $10,000, the purchase price paid by Smith at the sheriff's sale; such an amount as would equal taxes paid by defendants; all sums by the court found to be proper interest on moneys due, and any other sums found by the court to be lawfully due.

Thereafter the parties proceeded to trial by the court.

At the conclusion of plaintiffs' evidence defendant Smith demurred on the ground:

". . . that the plaintiffs' evidence fails to prove any cause of action in favor of the plaintiffs and against the defendant, M. R. Smith; that the plain-

tiffs' evidence fails to show that Jackson K. Hurd was incompetent at the time of the mortgage foreclosure; two, that the plaintiffs' evidence fails to show that Jackson K. Hurd possessed means with which to pay off the mortgage and would have tendered the amount due prior to the decree of foreclosure had he not been incapacitated."

Defendant Phoenix joined in this demurrer.

Both demurrers were sustained and plaintiffs have appealed from that ruling.

At the outset we are confronted with defendant Smith's challenge of plaintiffs' right to be heard, his contention being that as they procured only a partial transcript of the evidence the appeal should be dismissed, citing numerous decisions, among them being *Barker v. Chicago, R. I. & P. Rly. Co.*, 158 Kan. 549, 148 P. 2d 493.

The certificate of the official court reporter in the court below, attached to the transcript, certifies that he had transcribed such part of his stenographic notes taken at the trial "as were designated" by one of the plaintiffs, and who also appeared as counsel.

Our pertinent statute, G. S. 1949, 60-3311, provides:

"Either party to any case tried in a court of record having an official stenographer may direct such stenographer to transcribe and certify to the correctness of all of the stenographer's notes of the testimony and proceedings in the case *or any such part as such party may designate,* and such transcript shall be made, certified and filed with the clerk of such court  . . ."  (Our emphasis.)

The statute has been dealt with in many decisions of this court. They will not be cited and reviewed here. A number of them can be found in the annotations following the statute itself and in the opinion in the Barker case, *supra.* In some instances the failure to procure a complete transcript of all proceedings, or of one sufficiently complete, has resulted in dismissal of appeals. In others the result has been to limit the scope of appellate review, depending upon the facts and questions involved in the particular case. An examination of the decisions discloses that the decisive factor has been whether the transcript in a given case was sufficiently complete to furnish the basis for an abstract or counterabstract adequate for this court to have before it enough of the record below to be in a position to determine all questions raised on appeal.

In the Barker case, *supra,* for instance, which was a damage action and in which plaintiff prevailed, the appeal by defendants raised only two questions—alleged error by the lower court in overruling the demurrer to plaintiff's evidence, and in refusing to instruct the

jury to return a verdict in defendants' favor. Because of defendants' failure to procure a transcript containing all of the testimony this court dismissed the appeal and said:

"The rule is that to obtain a review of questions depending on the evidence the burden is on the appellant to produce a transcript containing sufficient evidence to establish his position beyond question. This he may do by a complete transcript or by a partial one on agreement between the parties that it contains all evidence material to the issues. Failing in this he acts at his own peril and may greatly restrict his scope of appellate review." (p. 554.)

As stated, the question there was the correctness of the order overruling defendants' demurrer and in failing to instruct the jury to return a verdict in their favor. In such a case the necessity for a complete or otherwise sufficient transcript is obvious under the familiar rule applicable to demurrers to evidence. Where a demurrer to evidence is *overruled* a defendant might procure a transcript including only that evidence favorable to him and entirely omitting evidence favorable to plaintiff, in which event this court would not be in a position to determine whether there was any evidence favorable to plaintiff which would preclude the lower court from sustaining the demurrer.

But that is not the situation before us. Here defendants' demurrers to plaintiffs' evidence were *sustained,* and, from a practical standpoint, all that is required is that plaintiffs bring to this court a record containing evidence supporting the allegations of their petition and theory of the case. They have done that. Assuming, for the sake of argument, there was testimony brought out in cross-examination of some of plaintiffs' witnesses which was favorable to defendants, the fact, for our purposes here, would be immaterial and would not have warranted the lower court in sustaining the demurrers. This is not an instance in which a plaintiff, *by his own testimony,* has "testified himself out of court" irrespective of other evidence favorable to him.

Under the facts and issues before us defendants' challenge of plaintiffs' right to be heard is without merit and cannot be sustained.

We therefore proceed to the question whether the demurrers to plaintiffs' evidence were properly sustained. In considering the matter it is necessary to keep in mind what was said in the quoted portion of the opinion in the former appeal, *supra,* as to the issues raised by the amended petition, namely, the incompetency of Hurd and his financial means at the times in question.

On the matter of incompetency, the court, in ruling on the demurrers, commented:

". . . and for the purposes of this discussion we may assume that the evidence does show, that at the time of the filing of the [foreclosure] suit and during its pendency, that Jackson K. Hurd was an incompetent person."

In their briefs and oral argument counsel for defendants concede that at all times material to the case Hurd was incompetent. In view of the court's finding and these concessions it really is unnecessary to discuss this phase of the evidence, but, nevertheless, we do so briefly for what light it may shed on the other question in controversy.

Expert medical testimony classified Hurd as suffering from a pernicious type of chronic schizophrenia, causing a complete indifference and obliviousness to the world and its affairs. The condition had existed for a number of years, dating back to at least 1943. In addition there was other evidence, both oral and written, which clearly established the fact of incompetency for a number of years prior to 1948. So much for that.

Now, with reference to the evidence concerning Hurd's financial means during the period in question, one witness, who had been actively engaged in the real estate business in the immediate area for thirty years, testified that as of February, 1948, the Hurd home (the property in question) was worth from $27,500 to $30,000. Another realtor testified that as of February, 1948, the property would have been an "awful good buy" at $28,500; that his client probably would have paid $29,500 for it then, and that with an expenditure of $5,000 for repairs the property would have been worth $38,500. Another witness, an Olathe banker, who had been appointed as one of the appraisers of Hurd's estate after the adjudication of incompetency, testified that the property in question would have supported a conservative loan of $15,000 in February, 1948; that two tracts of real estate in Jackson County, Missouri, owned by Hurd were worth $10,000 and would have supported a loan of $5,000, and that these loans could have been negotiated at a five percent interest rate. In passing, it is noted that the home, which was located on three acres of ground, contained a front hall, living room, sun room, dining room, den, breakfast room, kitchen, sleeping porch, four bedrooms, a bedroom dressing room, an over-the-garage sitting room, and five bath rooms.

In ruling on the demurrers the court, in commenting on what it

considered to be the import of our decision in the former appeal, *supra,* stated:

"The Supreme Court held, in upholding the petition of the plaintiff, that it sufficiently stated a defense, that he was unsound in mind and possessed means with which to pay off the mortgage and would have tendered the amount due under its terms prior to the rendering of the foreclosure decree, and thus defeated the cause of action for foreclosure of the mortgage. . . .

"Now, then, I think all the Court says is that under the petition the guardians alleged they had means with which to make the payment or to make the redemption. That doesn't yet appear."

From the last quoted sentence it seems clear the trial court based its ruling on the ground plaintiffs' evidence failed to establish that Hurd possessed the means with which to pay off the mortgage and would have tendered the amount due under its terms prior to the rendition of the foreclosure decree, thus defeating that action, had he not been mentally incapacitated.

We are unable to agree with the court's conclusion. The evidence established that at the time of the foreclosure suit Hurd was possessed of property worth approximately $40,000, with a ready loan value of at least $20,000. The mortgage indebtedness in question was less than $8,000. Among the many definitions of the word "means" we think "available or disposable financial resources" best fits the facts and questions here involved. Most certainly Hurd was possessed of such resources far in excess of his indebtedness.

And, insofar as the precise question before us is concerned, neither do we see substantial merit to defendants' contentions with respect to limitations on the power and authority of a guardian *ad litem,* had one been appointed for Hurd in the foreclosure action. What a guardian *ad litem* might or might not have been authorized to do in behalf of Hurd is immaterial if the evidence established that Hurd himself could and would have protected his interests but for his incompetency. In fairness to the trial court it should be stated that in the foreclosure proceedings the question of Hurd's incompetency was never raised, but, in any event, it is only logical to assume that a guardian *ad litem* would have taken such steps as would have called the court's attention to the circumstances then existing to the end that Hurd's rights would have been protected.

When tested by demurrer plaintiffs' evidence was entitled to all favorable inferences. Courts are not blind to practical, everyday facts of life and to commonly recognized traits and characteristics of mankind. As previously said, the foreclosure action was commenced on account of Hurd's default in reimbursing the mortgagee

for an insurance premium paid by it in the amount of $45. Is it reasonable to assume that a competent Hurd, who had everything to gain and nothing to lose by discharging his indebtedness, would not have done so at the earliest possible moment? We think not.

Plaintiffs' evidence was abundantly sufficient to establish the fact that Hurd was incompetent at the time of the foreclosure action; that he then possessed sufficient means with which to discharge his mortgage indebtedness, and that a competent Hurd, or any reasonably prudent person representing his interests, would have done so prior to rendition of the foreclosure decree.

The order of the lower court sustaining the demurrers to plaintiffs' evidence is therefore reversed.